NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1694-17T4

IN THE MATTER OF
RIDGEFIELD PARK BOARD
OF EDUCATION,

    Respondent-Respondent,

and

RIDGEFIELD PARK EDUCATION
ASSOCIATION,

    Petitioner-Appellant.

_____

<div style="border:1px solid black">

**APPROVED FOR PUBLICATION**

**May 3, 2019**

**APPELLATE DIVISION**

</div>

    Argued January 7, 2019 – Decided May 3, 2019

    Before Judges Sabatino, Sumners and Mitterhoff.

    On appeal from the New Jersey Public Employment Relations Commission, Docket Nos. SN-2017-047 and SN-2017-056.

    Steven R. Cohen argued the cause for appellant (Selikoff & Cohen, PA, attorneys; Steven R. Cohen, of counsel and on the briefs; Keith Waldman and Hop T. Wechsler, on the briefs).

    Kerri A. Wright argued the cause for respondent (Porzio, Bromberg & Newman, PC, attorneys; Kerri A. Wright, of counsel and on the brief; David L. Disler, on the brief).

Don Horowitz, Senior Deputy General Counsel, argued the cause for respondent New Jersey Public Employment Relations Commission (Christine Lucarelli-Carneiro, General Counsel, attorney; Don Horowitz, on the statement in lieu of brief).

Kathleen Asher argued the cause for amicus curiae New Jersey School Boards Association (Cynthia J. Jahn, General Counsel, attorney; Cynthia J. Jahn and Kathleen Asher, on the brief).

Ira W. Mintz argued the cause for amicus curiae Communication Workers of America, AFL-CIO (Weissman & Mintz, LLC, attorneys; Ira W. Mintz, on the brief).

The opinion of the court was delivered by

Sumners, J.A.D.

This dispute concerns the allowable scope of negotiations for employee contributions to health care and prescription coverage (collectively health insurance coverage) costs in accordance with L. 2011, c. 78, §§ 39 and 41 (Chapter 78), codified at N.J.S.A. 52:14-17.28c and N.J.S.A. 18A:16-17.1. Petitioner Ridgefield Park Education Association (the Association) appeals the scope of negotiations ruling by the Public Employment Relations Commission (PERC) in favor of respondent Ridgefield Park Board of Education (the Board), which held that Chapter 78 preempted the terms of the parties' collective

negotiations agreement for the period July 1, 2014 to June 30, 2018 (2014-2018 CNA or successor contract).

Chapter 78 prescribed health insurance contribution rates for public employees over a four-year period beginning July 1, 2011, at gradually increasing rates designated Tier 1, Tier 2, Tier 3 and Tier 4. The parties' collective negotiations agreement covering July 1, 2011 to June 30, 2014 (2011-2014 CNA) and the subsequent 2014-2018 CNA both provided that Association members contribute 1.5% of their salary or the minimum set forth by statute, regulation, or code towards health insurance. During the last year of the 2011-2014 CNA, the Association members had contributed at the Tier 3 level following their contributions at the Tier 1 and 2 levels during the agreement's first two years.

In the first year of the 2014-2018 CNA, Association members contributed at the Tier 4 level. Thereafter, based upon a PERC decision interpreting Chapter 78, the Association and the Board filed petitions for a scope of negotiations determination with PERC to determine if the legislation required Association members to contribute at the Tier 4 rate throughout the remaining three years of the 2014-2018 CNA contract and not the 1.5% contribution rate set forth therein.

Siding with the Board, PERC determined that under Chapter 78, based on the timing and length of the successor contract, the Association members were required to contribute at the Tier 4 rate throughout the remaining three years of the 2014-2018 CNA and not just the first year as contended by the Association. We reverse the final agency decision because we conclude that under the circumstances presented, PERC's interpretation of Chapter 78 is contrary to the Legislature's intent since it creates the absurd result of a financial hardship of having Association members contribute at the Tier 4 level for three additional years.

I

Enactment of Chapter 78

Seeking to stem the impact of rising costs of health insurance, the Legislature's 2011 enactment of Chapter 78 prescribed specific contribution rates for public employees' health insurance coverage. Chapter 78 mandated that public employees contribute to their health insurance coverage on a percentage-of-premium basis, with the percentage varying depending upon the employee's income and the type of coverage selected. The contribution rates were to be phased in over the course of four years, as follows:

> during the first year in which the contribution is effective, one-fourth of the amount of contribution;

during the second year in which the contribution is effective, one-half of the amount of contribution; and

during the third year in which the contribution is effective, three-fourths of the amount of contribution,

as that amount is calculated in accordance with section 39 of [L. ]2011, [c. ]78 ([N.J.S.A.] 52:14-17.28c).

[N.J.S.A. 18A:16-17.1(a).]

In no case, however, could the employee's contribution rate be less than the 1.5% of their base salary. N.J.S.A. 18A:16-17.1(a).[1] The financial impact of Chapter 78 was that employees were required "to contribute from three to thirty-five percent of their health care premium costs, rising with salary." In re New Brunswick Mun. Emps. Ass'n, 453 N.J. Super. 408, 416 (App. Div. 2018).[2]

---

[1] Chapter 78 allowed for a board of education to enter into a contract that provided "for an amount of employee contribution as a cost share or premium share that is other than the percentage required under subsection a. of this section," but only if the board certified, subject to approval by the Department of Education and the Division of Pension and Benefits in the Department of the Treasury, that the savings equaled or exceeded the savings from the contributions otherwise mandated under the law. N.J.S.A. 18A:16-17.1(b).

[2] For example, the record indicates that under Tier 4 employees earning from $50,000 to over $95,000, would contribute anywhere between 20% and 35% of their salary for single coverage; between 12% and 30% of their salary for family coverage; and between 15% and 30% of their salary for member/spouse/partner or parent/children coverage.

A-1694-17T4

Chapter 78 had a sunset provision, expiring four years after its effective date of June 28, 2011.[3]  However, in accordance with N.J.S.A. 18A:16-17.1(c),[4] public employers and employees were bound to complete full implementation of the four-tier contribution schedule, even if the date of full implementation occurred after Chapter 78's expiration date of June 28, 2014.  See also N.J.S.A. 18A:16-17.2.  Chapter 78 went into effect two days before the 2011-2014 CNA became effective.

---

[3]  L. 2011, c. 78, § 83.

[4]  Providing, in pertinent part,

> Once those employees are subjected to the contribution requirements set forth in subsection a. of this section, the public employers and public employees shall be bound by this act, [L. ]2011, [c. ]78, to apply the contribution levels set forth in [N.J.S.A. 52:14-17.28c] until all affected employees are contributing the full amount of the contribution, as determined by the implementation schedule set forth in [N.J.S.A. 18A:16-17.1(a)].  Notwithstanding the expiration date set forth in section 83 of this act, [L. ]2011, [c. ]78, or the expiration date of any successor agreements, the parties shall be bound to apply the requirements of this paragraph until they have reached the full implementation of the schedule set forth in [N.J.S.A. 18A:16-17.1(a)].

Furthermore, Chapter 78 addressed the negotiation of collective bargaining agreements to be executed after employees reached full implementation of the four-tier premium share, setting forth that the full premium share must be considered the status quo in such negotiations. The first and final sentences of N.J.S.A. 18A:16-17.2 provided:

> A public employer and employees who are in negotiations for the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share set forth in [N.J.S.A. 52:14-17.28c] shall conduct negotiations concerning contributions for health care benefits as if the full premium share was included in the prior contract.
>
> . . . .
>
> After full implementation, those contribution levels shall become part of the parties' collective negotiations and shall then be subject to collective negotiations in a manner similar to other negotiable items between the parties.

Health Insurance Contribution of Association Members

With the enactment of Chapter 78, the Association members' health insurance contribution rates under the 2011-2014 CNA were preempted and paid as follows:

| School Year | Chapter 78 Tier |
|---|---|
| July 1, 2011 to June 30, 2012 | Tier 1 |
| July 1, 2012 to June 30, 2013 | Tier 2 |
| July 1, 2013 to June 30, 2014 | Tier 3 |

On June 11, 2014, the parties reached an agreement on the 2014-2018 CNA. With regard to health insurance contribution levels, it contained the same language as the 2011-2014 CNA, stating at Article XXIII(A)(3): "Employees covered under this Article shall contribute the following percentage of their salary towards health insurance: 1.5% or the minimum set forth by statute, regulation, or code. Contributions shall be made through payroll deduction." Thereafter, consistent with the parties' understanding,[5] Association members contributed at the Tier 4 level for the first year – July 1, 2014 to June 30, 2015 – of the successor contract to satisfy the requirements of Chapter 78, and in the beginning of the second year – July 1, 2015 to June 30, 2016 – the members contributed 1.5% of their salaries in accordance with Article XXIII (A)(3).

---

[5] According to a certification of Ray Skorka, the New Jersey Education Association UniServ representative who assisted the Association in the contract negotiations.

 A-1694-17T4

<u>Disagreement Over Health Insurance Contribution</u>

In December 2015, the Board unilaterally altered the contribution rate of Association members. Citing Chapter 78 and the August 31, 2015 PERC decision in <u>Clementon Bd. of Educ. v Clementon Educ. Ass'n</u>, P.E.R.C. No. 2016-10, 42 N.J.P.E.R. ¶ 34, 2015 N.J. PERC LEXIS 76 (2015), District Superintendent Eric W. Koenig notified Association President David Tadros in a December 21 letter, that the Board's counsel advised that under Chapter 78, the 1.5% health insurance contribution level set forth in the 2014-2018 CNA is illegal and Association members must contribute at the Tier 4 level throughout the entire agreement.

In <u>Clementon Bd. of Educ.</u>, PERC determined that Chapter 78 "expressly, specifically and comprehensively sets forth that health benefit contribution levels become negotiable in the 'next collective negotiations agreement after . . . full implementation' of the four-tiered level of employee contributions is achieved." <u>Id.</u> at 6 (alteration in original) (quoting N.J.S.A. 18:16-17.2). PERC further explained:

> For example, if the parties agree to a contract with a one-year term, [the 1.5% of salary contribution level in their agreement] would be preempted by N.J.S.A. 18A:16-17.2 from July 1, 2014 to June 30, 2015, the final year of employee contributions at Tier 4 levels. However, it would not be preempted in the "next"

agreement when employee contribution levels become negotiable. Alternatively, if the parties agree to a multi-year successor agreement, the express language of N.J.S.A. 18A:16-17.2 would preempt [the 1.5% of salary contribution level in their agreement] for the first year of the successor agreement as well as any additional years in the agreement until the "next" agreement when employee contribution levels would become negotiable.

[Id. at 7.]

The superintendent asked the Association to voluntarily agree with the Board's position. However, in a December 27 reply letter, President Tadros stated that the Association disagreed with the advice of the Board's counsel, and opposed the continuation of Tier 4 contribution levels beyond the first year of the 2014-2018 CNA.

The Board, without the Association's consent, moved forward with its plan, commencing with salary deductions of Association members at the Tier 4 level on January 6, 2016, and declared that this contribution level would continue until the 2014-2018 CNA expired on June 30, 2018. Hence, Association members would be contributing at the Tier 4 level for the entire four years of the 2014-2018 CNA under the Board's interpretation of Chapter 78.

In response, the Association filed a grievance seeking the return of salary deductions for health insurance coverage contributions above the rate of 1.5%

A-1694-17T4

of each members' salary. The Association and the Board subsequently agreed to hold the grievance in abeyance pending this court's resolution of an appeal of PERC's ruling in Clementon Bd. of Education.

We, however, subsequently dismissed the appeal as moot because while it was pending, the parties in Clementon Bd. of Educ. negotiated two separate agreements: a one-year CNA, setting contribution at the Tier 4 level, and a successor three-year CNA, setting contribution at a collectively negotiated rate, as spelled out in PERC's ruling. In re Clementon Bd. of Educ., No. A-0372-15 (App. Div. Sept. 30, 2016) (slip op. at 9-13). Within weeks, the Association reinstated its grievance, which the Board denied. The dispute then went to binding arbitration with PERC appointing an arbitrator.

In the meantime, in a December 11, 2016 email, Superintendent Koenig notified Association members that the Board was further required to conform with Chapter 78, as "clarified" in the Clementon Bd. of Educ. PERC decision, by recovering the unpaid Tier 4 level contributions for the period of July 1, 2015 to January 5, 2016, because the contribution rate of 1.5% of the Association members' salary was "improper[ly]" deducted under Article XXIII (A)(3) of the 2014-2018 CNA. The superintendent stated that the unpaid contributions would

be recovered through the freezing of member salaries beginning in the upcoming 2017-2018 school year until the full Tier 4 contributions were paid.

PERC Scope of Negotiations Petitions

In June 2017, the Association filed a petition for a scope of negotiations determination with PERC, claiming that the negotiated 1.5% contribution rate was not preempted by statute or regulation. The Board subsequently filed its own petition for a scope of negotiations determination with PERC, seeking to restrain the Association's request for arbitration. PERC consolidated the two matters and issued a consolidated briefing schedule.

After rejecting the parties' respective contentions that there were procedural barriers to each other's petitions, PERC adopted the same reasoning it had reached earlier in Clementon Bd. of Educ. and granted the Board's request to restrain arbitration. The agency ruled:

> N.J.S.A. 18A:16-17.2 expressly, specifically and comprehensively sets forth that health benefit contribution levels become negotiable in the "next collective negotiations agreement after . . . full implementation" of the four-tiered level of employee contributions is achieved.
>
> Therefore, depending on the length of the successor agreement that the Board and the Association agree to, Article XVII.A.1 [of the CNA] may be preempted by N.J.S.A. 18A:16-17.2. For example, if the parties agree to a contract with a one-year term, Article XVII.A.1

would be preempted by N.J.S.A. 18A:16-17.2 from July 1, 2014 to June 30, 2015, the final year of employee contributions at Tier 4 levels.  However, it would not be preempted in the "next" agreement when employee contribution levels become negotiable.  Alternatively, if the parties agree to a multi-year successor agreement, the express language of N.J.S.A. 18A:16-17.2 would preempt Article XVII.A.1 for the first year of the successor agreement as well as any additional years in the agreement until the "next" agreement when employee contribution levels would become negotiable.

. . . .

The parties' 2014-2018 CNA is not the "next collective negotiations agreement after . . . full implementation of the contribution levels" within the meaning of N.J.S.A. 18A:16-17.2.  As the [T]ier [4] contribution level was reached in the first year of the parties' 2014-2018 CNA, the "next collective negotiations" agreement within the meaning of that statute will be the agreement that succeeds the 2014-2018 CNA.  Nothing in Chapter 78 pertaining to employee health care contributions suggests an alternative construction, and any other interpretation fails to give meaning to the specific terms set forth in N.J.S.A. 18A:16-17.2.

[In re Ridgefield Park Bd. of Ed., P.E.R.C. No. 2018-14. 44 N.J.P.E.R. ¶ 49, 2017 N.J. PERC LEXIS 82 at 13-14 (2017).]

Hence, PERC determined Chapter 78 dictated that Association members'

would contribute at the Tier 4 level during the entirety of the 2014-2018 CNA

13

even though they had contributed at that level in the agreement's first year. Id. at 15.

II

Before us, the Association, supported by amicus curiae Communications Workers of America, AFL-CIO, contends that PERC erred in interpreting Chapter 78 to determine that the Tier 4 health insurance contribution level should continue to apply throughout the last three years of the 2014-2018 CNA. Considering that its members contributed at the Tiers 1 through 3 levels under the 2011-2014 CNA and contributed at the Tier 4 level in the first year of the 2014-2018 CNA in accordance with Chapter 78, the Association maintains the collectively bargained contribution rate of 1.5% should be in effect.

Initially, the Association points out that this court should not afford any special deference to PERC's interpretation of Chapter 78 because the legislation does not fall within the Employer-Employee Relations Act (the Act), N.J.S.A. 34:13A-1 to -43, which is the source of PERC's jurisdiction. Concerning the particulars of the agency's interpretation, the Association contends PERC distorted Chapter 78 to give it broader application "than its actual wording," thereby frustrating the policy preference for collective bargaining under the Act. The Association maintains Chapter 78 does not satisfy the well-settled

requirement that in order for a statute to preempt collective bargaining on terms and conditions of employment – as here, for health insurance coverage – it must clearly do so. See Bethlehem Twp. Bd. Education v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 48 (1982); Council of N.J. State Coll. Locals v. State Bd. of Higher Educ., 91 N.J. 18, 30 (1982). The Association further argues Chapter 78 does not "state that a multi[-]year successor CNA that begins at Tier 4 contribution levels must continue at Tier 4 level[] for any, let alone all, remaining years of the agreement."[6]

To determine whether the parties were allowed to implement the negotiated 1.5% health insurance contribution level for the last three years of the 2014-2018 CNA after having carried out the Tier 1 through 3 contribution levels in the 2011-2014 CNA and the Tier 4 contribution level in the first year of the 2014-2018 CNA, we must decide if PERC properly decided that Chapter

---

[6] The Association also contends that after PERC consolidated the parties' scope petitions, it was disadvantaged when PERC extended the due dates for the Board's brief, which gave the Board the opportunity to submit a sur-reply, and prevented it from submitting a reply brief. This contention is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We merely state that PERC properly exercised its discretion under N.J.A.C. 19:13-3.6(b) to set forth a briefing schedule, and we see no prejudice to the Association's ability to fully present its legal arguments.

78 usurped the parties of their ability to collectively bargain the contribution level.

When reviewing a PERC ruling, we give deference to the agency's interpretation of the Act "unless its interpretations are plainly unreasonable, . . . contrary to the language of the Act, or subversive of the Legislature's intent[.]" N.J. Tpk. Auth. v. AFSCME, Council 73, 150 N.J. 331, 352 (1997). In other words, we will only disturb a PERC decision that "is clearly demonstrated to be arbitrary or capricious." City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 568 (1998) (citations omitted). Yet, in this case, we "owe no particular deference to PERC's interpretation of Chapter[] . . . 78," because despite "affect[ing] employer/employee relations, PERC is not charged with administering [the law]." New Brunswick Mun. Emps. Ass'n, 453 N.J. Super. at 413.

In determining the interpretation of a statute, our review is de novo. State v. Frank, 445 N.J. Super. 98, 105 (App. Div. 2016). It is well settled that a primary purpose of "statutory interpretation is to determine and 'effectuate the Legislature's intent.'" State v. Rivastineo, 447 N.J. Super. 526, 529 (App. Div. 2016) (quoting State v. Shelley, 205 N.J. 320, 323 (2011)). We start with considering "the plain 'language of the statute, giving the terms used therein

A-1694-17T4

their ordinary and accepted meaning.'" Ibid. And where "the Legislature's chosen words lead to one clear and unambiguous result, the interpretive process comes to a close, without the need to consider extrinsic aids." Rivastineo, 447 N.J. Super. at 529. Hence, we do "not 'rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (quoting Marino v. Marino, 200 N.J. 315, 329 (2009) (alteration in original)).

Yet, a statute's plain language "should not be read in isolation, but in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). "'[W]hen all is said and done, the matter of statutory construction . . . will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation.'" J.H. v. R&M Tagliareni, LLC, 454 N.J. Super. 174, 187 (2018) (quoting Jersey City Chapter, P.O.P.A. v. Jersey City, 55 N.J. 86, 100 (1969)). Thus, "where a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control." Hubbard v. Reed, 168 N.J. 387, 392 (2001) (quoting Turner v. First Union Nat'l Bank, 162 N.J. 75, 84 (1999)); see also

Gallagher v. Irvington, 190 N.J. Super. 394, 397 (App. Div. 1983) ("[a]n absurd result must be avoided in interpreting a statute.").

Applying these principles, we begin with the understanding that the right to negotiate health insurance contribution rates can be barred if "fully or partially preempted by statute or regulation . . . ." In re Local 195 IFPTE, 88 N.J. 393, 404 (1982). In our examination of Chapter 78, we do not take issue with the position of the Board and the amicus curiae of the New Jersey School Boards Association that PERC has interpreted the plain language of Chapter 78 to reach its decision that the parties were preempted from implementing the 1.5% contribution rate in the last three years of the 2014-2018 CNA.

The unambiguous language of the first sentence of N.J.S.A. 18A:16-17.2 provides that Chapter 78 Tier 4 contribution rates shall be deemed the status quo in any negotiations after full implementation of Chapter 78 rates. In this case, full implementation of Chapter 78 did not occur until the end of the 2014-2015 school year, which was the first year of the 2014-2018 CNA. Thus, when the parties were negotiating the 2014-2018 CNA, they were not negotiating "the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share" and the terms on

health care contributions were not subject to collective negotiations. N.J.S.A. 18A:16-17.2.

That said, the parties' actions are telling. After the Tier 4 contribution level was deducted from the Association members' salaries in the first year of the successor agreement, the Association members' contribution level in the second year of that agreement was initially based on 1.5% of their salary at the start of the second year on July 1, 2015. It was not until January 6, 2016, when the Board made salary deductions at the Tier 4 level, with the intention to continue to do so through the end of the 2014-2018 CNA, and to later recoup the uncollected Tier 4 level contributions retroactive to July 1, 2015, based upon PERC's interpretation of Chapter 78 as held in Clementon Bd. of Education. Clearly, the parties did not contemplate that Chapter 78 would preempt the 1.5% contribution rate covering the last three years of the 2014-2018 CNA when that agreement was reached. It is evident that they believed Chapter 78 had been fully implemented because the Association members made all of their Tier 1 through 4 contributions – albeit over two separate collective bargaining agreements.

Under these circumstances, interpreting Chapter 78 to require the Tier 4 contribution level for the remaining three years of the 2014-2018 CNA after the

19

Association members contributed at that level in the first year of that CNA creates an absurd result. Association members had previously contributed at Tiers 1 through 4. To require them to contribute at the Tier 4 level over the entirety of the 2014-2018 CNA, and not just the one year they did for July 1, 2014 through June 30, 2015, is contrary to the clear intent that public employees make these statutorily imposed increases over the course of four years.

For PERC to recognize that the Association could have avoided the Tier 4 contribution level for four years by having a one-year agreement and a three-year agreement, but not allow them to avoid that draconian impact because they did not do so in this case, is shortsighted. Based upon the parties' conduct, it is apparent that if they had the benefit of PERC's ruling in Clementon Bd. of Educ. when they were negotiating the 2014-2018 CNA, they would have entered into a one-year agreement for 2014-2015, providing for a Tier 4 contribution level, and a three-year agreement for 2015-2018, providing for 1.5% contribution level. See N.J.S.A. 18A:29-4.1 (permitting school boards to adopt "a one, two, three, four, or five year salary policy . . . for all full-time teaching staff members . . . ."[7]).

---

[7] This is exactly what the parties did in Clementon Bd. of Educ., resulting in our determination that their appeal was moot. Clementon Bd. of Educ., slip op. at 10-13.

A-1694-17T4

We feel constrained here to put aside the procedural gymnastics of a one-year agreement and a three-year agreement to reach a conclusion that is equitable. Association members fully contributed at the Tier 1 through 4 levels as contemplated by Chapter 78. Under the circumstances of this case, it is contrary to the spirit of Chapter 78 to force the Association members to make Tier 4 contributions for health insurance coverage for four years instead of just one year. Consequently, the matter is remanded to PERC to fashion and implement an appropriate remedial mechanism within sixty days to refund Association members for all of their health insurance contributions exceeding 1.5% of their salaries for the pay periods covering July 1, 2015 through June 30, 2018.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1694-17T4