SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**In the Matter of Ridgefield Park Board of Education** (A-2-19) (083091)

**Argued March 3, 2020 -- Decided August 17, 2020**

**Patterson, J., writing for the Court.**

In this appeal, the Court reviews the Public Employment Relations Commission's (PERC) decision that the employees' health insurance premium contribution rates for the duration of the 2014-2018 collective negotiations agreement (CNA) between the Ridgefield Park Board of Education (Board) and the Ridgefield Park Education Association (Association) were non-negotiable because those rates were preempted by L. 2011, c. 78 (Chapter 78).

Chapter 78 prescribed annual increases in health care contributions over four years for those employed by a local board of education and required those employees to achieve full implementation of the increased contributions (Tier 4) in the fourth year after the statute's effective date or, for employees already subject to a CNA, in the fourth year after the expiration of that agreement. Chapter 78 also provided that when an employer and its employees negotiated the next CNA after the employees in a bargaining unit reached full implementation of the share of the cost of health care premiums mandated by N.J.S.A. 52:14-17.28c, they would negotiate employee health care contributions as if that premium share were part of their previous CNA. N.J.S.A. 18A:16-17.2.

The Board and the Association negotiated a CNA covering 2011-2014 that went into effect three days after the Legislature enacted Chapter 78. The 2011-2014 CNA expired before the employees achieved full implementation of the premium share set forth in N.J.S.A. 52:14-17.28c (Tier 4). After the 2011-2014 CNA expired, the Board and the Association negotiated a CNA covering 2014-2018, which, like its predecessor, stated that employees shall contribute 1.5% of their salary towards health insurance or the minimum set forth by statute, regulation, or code.

During the 2014-2015 school year, the employees contributed to the cost of their health care at the full premium share required by N.J.S.A. 52:14-17.28c (Tier 4). The Board and the Association disputed Chapter 78's impact on employee contributions for the CNA's remaining three years. The Board contended that Chapter 78 preempted any negotiated term for those contributions and that the

1

Association's members were required to contribute to their health benefits at the Tier 4 level for the duration of the CNA. The Association contended that Chapter 78 did not preempt the 1.5% contribution rate set forth in the 2014-2018 CNA.

The Board and the Association petitioned PERC for a scope-of-negotiations determination. PERC held that the health insurance premium contribution rate set forth in the 2014-2018 CNA was preempted by Chapter 78 and granted the Board's request for a restraint of binding arbitration as to that issue. The Appellate Division reversed, determining that adherence to Chapter 78's plain language would bring about an "absurd result" contravening legislative intent, and required the employees to contribute only 1.5% of their salaries for the three contested years. 459 N.J. Super. 57, 61, 70-72 (App. Div. 2019).

The Court granted the Board's petition for certification. 239 N.J. 393 (2019).

**HELD:** The health insurance premium contribution rates paid by the Association's members were preempted by statute and therefore non-negotiable. PERC's construction of Chapter 78 comports with the statute's language and the Legislature's stated objective to achieve a long-term solution to a fiscal crisis.

1. The determination of whether a subject is properly negotiable in negotiations between public employers and their employees is governed by the three-part test set forth in In re Local 195, 88 N.J. 393, 403-04 (1982). This case implicates the preemption prong of that test. Thus, to review PERC's decision that the rates in question were non-negotiable, the Court considers whether the plain language of N.J.S.A. 18A:16-17.2 evinces the Legislature's intent to preempt any negotiated provision in the parties' 2014-2018 CNA regarding employee contributions to their health care benefits. (pp. 20-23)

2. N.J.S.A. 18A:16-17.2's first sentence addresses "public employer[s] and employees who are in negotiations for the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share . . . ." (emphases added). And in its final sentence, N.J.S.A. 18A:16-17.2 provides that after "full implementation," the employees' contribution levels "shall become part of the parties' collective negotiations and shall then be subject to collective negotiations in a manner similar to other negotiable items between the parties." Accordingly, during the negotiations for the next CNA after full implementation is reached -- here, the negotiations for the agreement that would succeed the 2014-2018 CNA -- the Tier 4 contribution levels would constitute the status quo. The Legislature did not expressly discuss the scenario in this case, in which the employees reached "full implementation" of the premium share with three years remaining in the term of their current CNA. It implicitly addressed the setting

2

of this case, however, by making the Tier 4 contribution rate the status quo from which a successor CNA would be negotiated. Moreover, nothing in the statute authorizes an immediate reduction of employee health care contribution rates to their pre-Chapter 78 levels. (pp. 23-26)

3. To the extent that N.J.S.A. 18A:16-17.2 leaves any ambiguity as to legislative intent, the legislative history of Chapter 78 resolves that ambiguity. The Legislature viewed public employee health care costs to present a fiscal crisis and acted to provide a long-term solution to that crisis. The Legislature did not enact Chapter 78 to achieve only a transient increase in employees' health insurance premium contributions, followed by an immediate reversion to pre-statute contribution rates as soon as employees had contributed at the Tier 4 level for a year. Instead, it envisioned that Chapter 78 would increase employee health insurance premium contributions over the long term. In short, the construction of N.J.S.A. 18A:16-17.2 urged by the Board and adopted by PERC is consonant with the Legislature's intent, as reflected by Chapter 78's stated goals and legislative history. (pp. 26-30)

4. N.J.S.A. 18A:16-17.2's impact on employee health benefit contributions based on the timing of a given CNA is not an "absurd result" warranting a departure from the statute's terms. The Legislature clearly understood that school districts negotiate contracts on different schedules, and that the statute's impact would vary from district to district. Nonetheless, the Legislature envisioned that the transition between Tier 4 health insurance premium contribution rates set by Chapter 78 and contribution rates negotiated by school boards and employees would take place in the negotiations for the next CNA, not at some earlier stage. (pp. 30-32)

**The judgment of the Appellate Division is REVERSED, and the matter is REMANDED to PERC.**

**JUSTICE ALBIN, dissenting,** expresses the view that the result reached by the majority is mandated by neither the language nor the legislative history of Chapter 78 and deprives the Association the benefit of its CNA with the Board. Had the Association the prescience to foresee how the majority would interpret Chapter 78, Justice Albin writes, it undoubtedly would have entered a one-year contract with the Board, during which Tier 4 would have been implemented, and begun negotiations anew. Justice Albin concludes that the decision here, which strikes down terms in a negotiated agreement, is unfair and unreasonable, and not consistent with the Legislature's probable intent in Chapter 78.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a dissent.**

3

# SUPREME COURT OF NEW JERSEY

## A-2 September Term 2019

## 083091

In the Matter of
Ridgefield Park Board of Education,

Respondent-Appellant,

and

Ridgefield Park Education Association,

Petitioner-Respondent.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
459 N.J. Super. 57 (App. Div. 2019).

| Argued | Decided |
|--------|---------|
| March 3, 2020 | August 17, 2020 |

Kerri A. Wright argued the cause for appellant (Porzio, Bromberg & Newman, attorneys; Kerri A. Wright, of counsel and on the briefs, David L. Disler and Thomas J. Reilly, on the briefs).

Steven R. Cohen argued the cause for respondent (Selikoff & Cohen, attorneys; Steven R. Cohen, of counsel and on the briefs, Keith Waldman and Hop T. Wechsler, on the brief).

Kathleen Asher argued the cause for amicus curiae New Jersey School Boards Association (New Jersey School Boards Association, attorneys; Kathleen Asher and on the brief).

1

Ira W. Mintz argued the cause on behalf of amicus curiae Communications Workers of America, AFL-CIO (Weissman & Mintz, attorneys; Ira W. Mintz, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

This appeal arises from a dispute between the Ridgefield Park Board of Education (Board) and the Ridgefield Park Education Association (Association) concerning Board employees' obligations to contribute to the cost of their health care benefits under L. 2011, c. 78 (Chapter 78).

Chapter 78 prescribed annual increases in health care contributions over four years for those employed by a local board of education at the time of the statute's enactment. N.J.S.A. 18A:16-17.1(a); N.J.S.A. 52:14-17.28c. It required those employees to achieve full implementation of the increased contributions (Tier 4) in the fourth year after the statute's effective date or, for employees already subject to a collective negotiations agreement (CNA), in the fourth year after the expiration of that agreement. N.J.S.A. 18A:16-17.1(c); N.J.S.A. 52:14-17.28d(c). Chapter 78 also provided that when an employer and its employees negotiated the next CNA after the employees in a bargaining unit reached full implementation of the share of the cost of health care premiums mandated by N.J.S.A. 52:14-17.28c, they would negotiate employee

health care contributions as if that premium share were part of their previous CNA. N.J.S.A. 18A:16-17.2.

Here, the Board employees achieved the Tier 4 contribution levels, and thus full implementation of the mandated premium share, at the end of the first year of their 2014-2018 CNA. The Board and the Association agreed that Chapter 78 preempted the parties' CNA as it applies to employees' premium share for the 2014-2018 CNA's first year but disputed the statute's impact on employee contributions for the CNA's remaining three years. The Board contended that Chapter 78 preempted any negotiated term for those contributions; the Association countered that the parties agreed to a lower level of contributions and that their CNA, not Chapter 78, determined the employees' obligations.

The Board and the Association petitioned the New Jersey Public Employment Relations Commission (PERC) for a scope-of-negotiations determination. PERC ruled in the Board's favor. In re Ridgefield Park Bd. of Educ., P.E.R.C. No. 2018-14, 44 N.J.P.E.R. ¶ 49 at ___ (slip op. 12), 2017 N.J. PERC LEXIS 82 at *13-14 (2017).

The Appellate Division reversed PERC's determination. In re Ridgefield Park Bd. of Educ., 459 N.J. Super. 57, 72 (App. Div. 2019). It recognized that Chapter 78's plain language required the Association's

3

members to contribute to their health care costs at the Tier 4 level for an additional three years because they had achieved that level in the first year of a four-year CNA. Id. at 70-71. It determined, however, that application of the statute consistent with its plain language would bring about an "absurd result," contravening legislative intent. Id. at 61, 70-71. The Appellate Division required the employees to contribute only 1.5% of their salaries for their health care benefits for the three contested years. Id. at 72.

We recognize a legitimate argument that N.J.S.A. 18A:16-17.2 makes clear that when employees reach the Tier 4 contribution level in the first year of a CNA, they must continue to contribute at that level until they negotiate a successor CNA providing for a lower rate of contribution, and that successor CNA goes into effect. When the statutory language is considered in conjunction with Chapter 78's purpose and legislative history, that legislative intent is plain. We view PERC's construction of Chapter 78 to comport with the statute's language and the Legislature's stated objective to achieve a long-term solution to a fiscal crisis. We do not share the Appellate Division's view that PERC's interpretation of the statute gives rise to an absurd result.

Accordingly, we reverse the Appellate Division's judgment and remand the matter to PERC for further proceedings.

I.

A.

When the Legislature enacted Chapter 78 on June 28, 2011, it amended several statutes relating to public employee health benefits. See L. 2011, c. 78. Among other provisions, Chapter 78 required that a public employee contribute a specified percentage of the premiums charged for his or her health care benefits based on his or her annual income. N.J.S.A. 52:14-17.28c.

As part of Chapter 78, the Legislature enacted two Title 18A provisions that are relevant to this appeal. First, N.J.S.A. 18A:16-17.1(a) prescribes contribution levels for current school board employees that increase annually over four years:

> Notwithstanding the provisions of any other law to the contrary, public employees, as specified herein, of a local board of education shall contribute, through the withholding of the contribution from the pay, salary, or other compensation, toward the cost of health care benefits coverage for the employee and any dependent provided pursuant to L. 1979, c. 391 ([N.J.S.A.] 18A:16-12 et seq.), unless the provisions of subsection b. of this section apply, in an amount that shall be determined in accordance with section 39 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c), except that, employees employed on the date on which the contribution commences, as specified in subsection c. of this section, shall pay:

5

during the first year in which the contribution is effective, one-fourth of the amount of contribution;

during the second year in which the contribution is effective, one-half of the amount of contribution; and

during the third year in which the contribution is effective, three-fourths of the amount of contribution,

as that amount is calculated in accordance with section 39 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c).

Pursuant to Chapter 78's "sunset" provision, several sections of that statute, including N.J.S.A. 18A:16-17.1, "shall expire four years after the effective date." L. 2011, c. 78, § 83.

Second, in N.J.S.A. 18A:16-17.2, the Legislature addressed the impact of Chapter 78's tiered health care contributions on CNAs that govern board of education employees:

A public employer and employees who are in negotiations for the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share set forth in section 39 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c) shall conduct negotiations concerning contributions for health care benefits as if the full premium share was included in the prior contract. The public employers and public employees shall remain bound by the provisions of sections 39 and 41 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c and [N.J.S.A.] 18A:16-17.1), notwithstanding the expiration of those sections, until the full amount of the contribution

6

required by section 39 has been implemented in accordance with the schedule set forth in section 41.

Employees subject to any collective negotiations agreement in effect on the effective date of L. 2011, c. 78, that has an expiration date on or after the expiration of sections 39 through 44, inclusive, of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c et al.), shall be subject, upon expiration of that collective negotiations agreement, to sections 39 and 41 until the health care contribution schedule set forth in section 41 is fully implemented.

After full implementation, those contribution levels shall become part of the parties' collective negotiations and shall then be subject to collective negotiations in a manner similar to other negotiable items between the parties.

The import of N.J.S.A. 18A:16-17.2 is the central issue in this appeal.

B.

On June 28, 2011, when Chapter 78 became law, the Board and the Association were governed by a CNA effective from July 1, 2008 to June 30, 2011 (2008-2011 CNA), which required the Board to "provide the health care protection hereinafter set forth" in the CNA and to "pay the full premium for each employee and, in cases where appropriate, for family insurance coverage." While the 2008-2011 CNA was in effect, the Legislature enacted a statute requiring employees of local boards of education to pay 1.5% of base salary for their health care benefits coverage. N.J.S.A. 18A:16-17(b).

After the 2008-2011 agreement expired, the Board and the Association negotiated a successor CNA for the period between July 1, 2011 and June 30, 2014 (2011-2014 CNA). That CNA went into effect three days after the Legislature enacted Chapter 78.

The 2011-2014 CNA, like its predecessor, stated that the Board "shall pay the full premium for each employee and, in cases where appropriate, for family insurance coverage," but it also provided that "[e]mployees covered under this Article shall contribute the following percentage of their salary towards health insurance: 1.5% or the minimum set forth by statute, regulation, or code. Contributions shall be made through payroll deduction."

In accordance with N.J.S.A. 18A:16-17.1, the Board's employees paid one-fourth of the contribution required by N.J.S.A. 52:14-17.28c (Tier 1) during the first year in which the mandated contribution was effective, the 2011-2012 school year. They paid half of the contribution required by N.J.S.A. 52:14-17.28c (Tier 2) during the second year in which the mandated contribution was effective, the 2012-2013 school year. The employees paid three-fourths of the contribution required by N.J.S.A. 52:14-17.28c (Tier 3) during the third year in which the mandated contribution was effective, the 2013-2014 school year. The 2011-2014 CNA expired before the employees

8

achieved full implementation of the premium share set forth in N.J.S.A. 52:14-17.28c (Tier 4).

After the 2011-2014 CNA expired, the Board and the Association negotiated a successor agreement to be effective from July 1, 2014 to June 30, 2018 (2014-2018 CNA). On June 11, 2014, they entered into a Memorandum of Agreement (MOA) that stated that "[a]ll portions of the expired agreement not modified by the terms of this Memorandum shall continue to be of full force and effect and be incorporated into the successor agreement." The MOA identified agreed-upon changes to be incorporated into a successor agreement. None related to employees' contributions to the cost of their health care benefits.

The 2014-2018 CNA, like its predecessor, stated that "[e]mployees covered under this Article shall contribute the following percentage of their salary towards health insurance: 1.5% or the minimum set forth by statute, regulation or code. Contributions shall be made through payroll deduction."

During the 2014-2015 school year, the first year in which the 2014-2018 CNA was in effect, the employees contributed to the cost of their health care at the full premium share required by N.J.S.A. 52:14-17.28c (Tier 4). The Board and the Association agreed that Chapter 78 required the Association's members to contribute at the Tier 4 level during that initial year of the 2014-

2018 CNA. During the second year of the 2014-2018 CNA, however, the Association's members contributed only 1.5% of their salaries to the cost of their health care.

On August 13, 2015, PERC decided Clementon Board of Education v. Clementon Education Ass'n, P.E.R.C. No. 2016-10, 42 N.J.P.E.R. ¶ 34, 2015 N.J. PERC LEXIS 76 (2015). In Clementon, the Board of Education petitioned for a scope-of-negotiations determination that the health benefits provision of its CNA was preempted by N.J.S.A. 18A:16-17.2. Id. at 118. PERC agreed with the Clementon Board of Education, and ruled that the statute "expressly, specifically and comprehensively sets forth that health benefit contribution levels become negotiable in the 'next collective negotiations agreement after . . . full implementation' of the four-tiered level of employee contributions is achieved." Id. at 118-19 (ellipsis in original) (emphasis added) (quoting N.J.S.A. 18A:16-17.2).

On December 21, 2015, the Board informed the Association that it viewed the health insurance provision in the 2014-2018 CNA to violate Chapter 78, as interpreted by PERC in Clementon. The Board asked the Association to voluntarily "revise and reform" the CNA so that the Association's members would contribute to their health benefits at the Tier 4

10

level for the duration of the CNA, "to comply with the law." The Association disagreed and declined to amend the CNA.

The Board then reinstated payroll deductions reflecting employee contributions to health care costs at the Tier 4 level. The Board took the position that employee contributions would remain at the Tier 4 level for the duration of the 2014-2018 CNA and announced that it would freeze employee salaries until the employees had contributed amounts sufficient to satisfy their obligations under Chapter 78.

C.

1.

The Association filed a grievance with respect to its members' health care contributions. The Board and Association agreed to hold the grievance in abeyance pending the Appellate Division's review of PERC's decision in Clementon.

The Appellate Division, however, did not decide the question raised in the Clementon appeal. In the wake of PERC's decision in that matter, the parties in Clementon negotiated two new agreements to replace their four-year CNA: a CNA to be in effect for only one year, during which the employees would contribute to their health care costs at Tier 4 levels, and a three-year CNA, under which the employees would contribute at a negotiated rate. Given

11

the parties' resolution of the dispute in Clementon, the Appellate Division dismissed the appeal in that case as moot.

After the Appellate Division dismissed the appeal in Clementon, the Association reinstated its grievance in this matter. The Superintendent of Schools denied the grievance, citing PERC's decision in Clementon. The Association advanced its grievance to the Board, which also denied it. At the Association's request, PERC referred the matter to arbitration and appointed an arbitrator.

The Association filed with PERC a petition for a scope-of-negotiations determination, requesting binding arbitration. The Association contended that Chapter 78 did not preempt the 1.5% contribution rate set forth in the 2014-2018 CNA. The Board petitioned for a scope-of-negotiations determination in which it sought to enjoin the binding arbitration requested by the Board.

PERC consolidated the two scope-of-negotiations petitions. Relying on its decision in Clementon, PERC ruled in favor of the Board. In re Ridgefield Park Bd. of Educ., 44 N.J.P.E.R. ¶ 49 at ___ (slip op.at 12).

PERC noted that "N.J.S.A. 18A:16-17.2 expressly, specifically and comprehensively sets forth that health benefit contribution levels become negotiable in the 'next collective negotiations agreement after . . . full implementation' of the four-tiered level of employee contributions is

achieved." Id. ¶ 49 at ___ (slip op. at 4-5) (quoting Clementon Bd. of Educ., 42 N.J.P.E.R. ¶ 34 at 118-19). PERC reiterated its holding in Clementon that "depending on the length of the successor agreement that the Board and Association agree to," the disputed health care costs provision of the parties' CNA "may be preempted by N.J.S.A. 18A:16-17.2." Id. ¶ 49 at ___ (slip op. at 5) (quoting Clementon Bd. of Educ., 42 N.J.P.E.R. ¶ 34 at 118-19). It restated the example it gave in the Clementon decision:

> if the parties agree to a contract with a one-year term, [the parties' negotiated health care contribution provision] would be preempted by N.J.S.A. 18A:16-17.2 from July 1, 2014 to June 30, 2015, the final year of employee contributions at Tier 4 levels. However, it would not be preempted in the "next" agreement when employee contribution levels would become negotiable. Alternatively, if the parties agree to a multi-year successor agreement, the express language of N.J.S.A. 18A:16-17.2 would preempt [the parties' negotiated health care contribution provision] for the first year of the successor agreement as well as any additional years in the agreement until the "next" agreement when employee contribution levels would become negotiable.
>
> [Id. ¶ 49 at ___ (slip op. at 5) (quoting Clementon Bd. of Educ., 42 N.J.P.E.R. ¶ 34 at 118-19).]

Addressing this matter, PERC reasoned that because "the tier four contribution level was reached in the first year of the parties' 2014-2018 CNA, the 'next collective negotiations' agreement within the meaning of [N.J.S.A.

13

18A:16-17.2] will be the agreement that succeeds the 2014-2018 CNA." Id. ¶ 49 at ___ (slip op. at 10). PERC found "[n]othing in Chapter 78 pertaining to employee health care contributions" to suggest a different construction of N.J.S.A. 18A:16-17.2 and concluded that "any other interpretation fails to give meaning to the specific terms" of the statute. Id. ¶ 49 at ___ (slip op. at 11).

Accordingly, PERC held that the health insurance premium contribution rate set forth in the 2014-2018 CNA was preempted by Chapter 78 and granted the Board's request for a restraint of binding arbitration as to that issue.[1] Id. ¶ 49 at ___ (slip op. at 11).

2.

The Association appealed. The Appellate Division granted amicus curiae status to the New Jersey School Boards Association and the Communications Workers of America, AFL-CIO.

The Appellate Division acknowledged that PERC's determinations are ordinarily afforded deference and will be disturbed only if they are "clearly demonstrated to be arbitrary or capricious." Ridgefield Park Bd. of Educ., 459

_____

[1] PERC noted that the record was unclear as to whether the Association had requested negotiation of the amount and timing of any recoupment from employees of underpaid amounts. Ridgefield Park Bd. of Educ., 44 N.J.P.E.R. ¶ 49 at ___ (slip op. at 11). It ordered that if the Association had not previously sought negotiations on the amount and timing of recoupment, "the Board shall meet and negotiate with the Association over those issues upon request." Id. ¶ 49 at ___ (slip op. at 12).

N.J. Super. at 69 (quoting City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 568 (1998)).  The court reasoned, however, that it "'owe[d] no particular deference to PERC's interpretation of Chapter [78],' because despite 'affect[ing] employer/employee relations, PERC is not charged with administering'" that statute.  Ibid. (third alteration in original) (quoting In re New Brunswick Mun. Emps. Ass'n, 453 N.J. Super. 408, 413 (App. Div. 2018)).  The court accordingly reviewed PERC's interpretation of Chapter 78 de novo.  Ibid.

The Appellate Division recognized that "[t]he unambiguous language of the first sentence of N.J.S.A. 18A:16-17.2 provides that Chapter 78 Tier 4 contribution rates shall be deemed the status quo in any negotiations after full implementation of Chapter 78 rates," and that, in this matter, it was not until the end of the 2014-2015 school year that "full implementation" of those rates occurred.  Id. at 70.  The court acknowledged that "when the parties were negotiating the 2014-2018 CNA, they were not negotiating 'the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share[,]' and the terms on health care contributions were not subject to collective negotiations."  Id. at 70-71 (quoting N.J.S.A. 18A:16-17.2).

15

The Appellate Division, however, found the parties' actions to be "telling," in that the Board required the Association's members to pay only 1.5% of their salaries as the 2014-2018 CNA provided until PERC decided Clementon. Id. at 72. The court dismissed as "shortsighted" PERC's suggestion that the Association could have avoided a four-year period of Tier 4 contributions by entering into a one-year agreement followed by a three-year agreement. Ibid. In the Appellate Division's view, PERC's interpretation of Chapter 78 "create[d] an absurd result" by compelling employees to "contribute at the Tier 4 level over the entirety of the 2014-2018 CNA" -- or to adhere to the statutorily imposed rates for a total of seven years -- which would be contrary to the Legislature's "clear intent that public employees make these statutorily imposed increases over the course of four years." Id. at 71.

The Appellate Division therefore reversed PERC's determination and remanded for PERC to implement a remedy that would "refund Association members for all of their health insurance contributions exceeding 1.5% of their salaries for the pay periods covering July 1, 2015 through June 30, 2018." Id. at 72. It denied the Board's motions for reconsideration of its decision and for a stay of its judgment.

3.

We granted the Board's petition for certification. 239 N.J. 393 (2019).

II.

A.

The Board contends that the only question before the Appellate Division was whether Chapter 78 preempted the provision in the parties' 2014-2018 CNA that set employee contributions for health care at "1.5% or the minimum set forth by statute, regulation, or code." In the Board's view, the Appellate Division agreed with the Board's assertion that Chapter 78 preempted that language in the parties' CNA. The Board asserts that the Appellate Division's interpretation of the statute's plain language should have ended the inquiry.

The Board argues that because N.J.A.C. 19:13-1.1 precludes the resolution of factual issues during a scope-of-negotiations proceeding before PERC, it did not submit evidence to PERC that would have demonstrated that the parties never agreed to the 1.5% limitation found by the Appellate Division. It contends that the Appellate Division improperly considered the Association's certification and engaged in factfinding to rule in favor of the Association, thus usurping the role of PERC and the designated arbitrator.

B.

The Association disputes the Board's contention that the Appellate Division viewed Chapter 78 to preempt the 2014-2018 CNA. It states that the Appellate Division declined to find preemption in order to avoid an absurd result that would have contravened public policy, and that the court properly construed the statute as the Legislature intended to achieve a rational outcome.

The Association argues that the Appellate Division did not engage in improper factfinding in its scope-of-negotiations determination, and that the court properly decided the appeal based on the facts stated in an uncontested certification that it submitted to the court. It asserts that the remedy sought by the Board would nullify a negotiated, executed, and implemented CNA provision, merely because the parties agreed to a single CNA, not two separate contracts, for the 2014-2018 period.

C.

PERC advised the Court that it took no position on the Board's petition for certification. PERC similarly takes no position on the merits of this appeal.

D.

Amicus curiae New Jersey School Boards Association asserts that Chapter 78 preempts collective negotiations with respect to employee health

18

benefit contributions for any CNA that is effective prior to the full implementation of Tier 4 contributions that the statute requires. Amicus contends that PERC's decision, which may encourage parties to enter into shorter-term contracts, does not contravene public policy or destabilize labor relations.

E.

Amicus curiae Communications Workers of America, AFL-CIO concurs with the Association that the Appellate Division properly held that PERC's decision gave rise to an absurd result. It contends that if the Legislature intended that employees contribute to their health care costs at Tier 4 levels for the four years of a CNA, Chapter 78 would have clearly mandated that outcome.

III.

A.

"PERC has primary jurisdiction to determine in the first instance whether a matter in dispute is within the scope of collective negotiations." New Brunswick Mun. Emps. Ass'n, 453 N.J. Super. at 413 (citing N.J.S.A. 34:13A-5.4(d)). As we have noted,

> [t]he judicial role when reviewing an action of an administrative agency is generally restricted to three inquiries:

19

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policy to the facts, the agency erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Jersey City Police Officers Benevolent Ass'n, 154 N.J. at 567 (quoting In re Musick, 143 N.J. 206, 216 (1996)).]

Thus, "[i]n the absence of constitutional concerns or countervailing expressions of legislative intent, we apply a deferential standard of review to determinations made by PERC." Ibid.

Nonetheless, "when an agency's decision is based on the 'agency's interpretation of a statute or its determination of a strictly legal issue,' we are not bound by the agency's interpretation." Saccone v. Bd. of Trs., PFRS, 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 27 (2011)). Instead, we review that determination de novo. Ibid.

B.

In this appeal, we review PERC's decision that the employees' health insurance premium contribution rates for the duration of the parties' 2014-2018 CNA were non-negotiable. See Ridgefield Park Bd. of Educ., 44 N.J.P.E.R. ¶ 49 at ___ (slip op. at 10-11).

20

PERC's scope-of-negotiations determination is governed by a "time-honored" standard. Robbinsville Twp. Bd. of Educ. v. Washington Twp. Educ. Ass'n, 227 N.J. 192, 199 (2016). In negotiations between public employers and their employees, a subject

> is properly negotiable when it satisfies a three-part test: "(1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy."
>
> [Ibid. (quoting In re Local 195, 88 N.J. 393, 403-04 (1982)).]

See also In re Cty. of Atl., 230 N.J. 237, 253 (2017) (same).

This case implicates the preemption prong of the Local 195 test. In the preemption inquiry, "the mere existence of legislation relating to a given term or condition of employment does not automatically preclude negotiations." Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n, 91 N.J. 38, 44 (1982). Instead, "[n]egotiation is preempted only if the regulation fixes a term and condition of employment 'expressly, specifically and comprehensively.'" Ibid. (quoting Council of N.J. State Coll. Locals, NJSFT-AFT/AFL-CIO v. State Bd. of Higher Educ., 91 N.J. 18, 30 (1982)). Under the preemption standard,

[t]he legislative provision must "speak in the imperative and leave nothing to the discretion of the public employer." If the legislation, which encompasses agency regulations, contemplates discretionary limits or sets a minimum or maximum term or condition, then negotiation will be confined within these limits. Thus, the rule established is that legislation "which expressly set[s] terms and conditions of employment . . . for public employees may not be contravened by negotiated agreement."

[Ibid. (citations omitted).]

Thus, to review PERC's decision that health insurance premium contribution rates governing the Board's employees were non-negotiable, we determine whether the Legislature intended N.J.S.A. 18A:16-17.2 to preempt the parties' negotiations as to that issue during the relevant years.

C.

When a court construes a statute, its "paramount goal" is to discern the Legislature's intent. DiProspero v. Penn, 183 N.J. 477, 492 (2005). We "look first to the statute's actual language and ascribe to its words their ordinary meaning." Kean Fed'n of Teachers v. Morell, 233 N.J. 566, 583 (2018). "'[T]he best indicator of [the Legislature's] intent is the statutory language,' thus it is the first place we look." Richardson v. Bd. of Trs., PFRS, 192 N.J. 189, 195 (2007) (first alteration in original) (quoting DiProspero, 183 N.J. at

22

492). "If the plain language leads to a clear and unambiguous result, then our interpretive process is over." Ibid.

Nonetheless, "not every statute is a model of clarity." Wilson ex rel Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). "Where the statutory language is ambiguous, we may consider extrinsic materials such as legislative history, committee reports, and other relevant sources." Kean Fed'n of Teachers, 233 N.J. at 583. "Where available, '[t]he official legislative history and legislative statements serve as valuable interpretive aid[s] in determining the Legislature's intent.'" State v. Drury, 190 N.J. 197, 209 (2007) (alterations in original) (quoting State v. McQuaid, 147 N.J. 464, 480 (1997)).

D.

1.

Guided by those principles of statutory construction, we consider whether the plain language of N.J.S.A. 18A:16-17.2 evinces the Legislature's intent to preempt any negotiated provision in the parties' 2014-2018 CNA regarding employee contributions to their health care benefits.[2]

---

[2] We do not concur with the Board that the Appellate Division conceded that N.J.S.A. 18A:16-17.2 preempts the health care contribution terms of a negotiated CNA. Invoking "[t]he unambiguous language of the first sentence of N.J.S.A. 18A:16-17.2," the Appellate Division acknowledged that the 2014-2018 CNA was not the "'next collective negotiations agreement to be executed

23

As the parties agree and the Appellate Division recognized, the employees in this matter did not reach "full implementation" of the "premium share set forth in [N.J.S.A. 52:14-17.28c]" until the 2014-2015 school year concluded. See N.J.S.A. 18A:16-17.2; Ridgefield Park Bd. of Educ., 459 N.J. Super. at 70 (noting that "full implementation of Chapter 78 did not occur until the end of the 2014-2015 school year, which was the first year of the 2014-2018 CNA"). Accordingly, the CNA in effect when the employees reached "full implementation" of the premium share was the 2014-2018 CNA.

N.J.S.A. 18A:16-17.2's first sentence addresses "public employer[s] and employees who are in negotiations for the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share set forth in [N.J.S.A. 52:14-17.28c]." (emphases added). Applied here, that statutory language refers not to the

_____

after the employees in that unit have reached full implementation of the premium share,'" and that under the statute, "the terms on health care contributions were not subject to collective negotiations." Ridgefield Park Bd. of Educ., 459 N.J. Super. at 70-71 (quoting N.J.S.A. 18A:16-17.2). The appellate court nonetheless declined to construe the statute to preempt the parties' CNA on the grounds that a literal interpretation of N.J.S.A. 18A:16-17.2 would produce an "absurd result," and would contravene "the clear intent that public employees make these statutorily imposed increases over the course of four years." Id. at 61, 70-71. Having construed N.J.S.A. 18A:16-17.2 as the Association urged, the Appellate Division held that the statute did not preempt the 2014-2018 CNA's health care contribution provisions. Id. at 71-72.

parties' negotiations for the 2014-2018 CNA, but to their negotiations for its successor agreement.  Thus, notwithstanding L. 2011, c. 78, § 83 -- Chapter 78's "sunset" provision -- the Board argues that the statute indicates that the employees' health insurance premium contribution rate was not negotiable until the Board and the Association negotiated a successor CNA.

In its final sentence, N.J.S.A. 18A:16-17.2 provides that after "full implementation," the employees' contribution levels "shall become part of the parties' collective negotiations and shall then be subject to collective negotiations in a manner similar to other negotiable items between the parties." The Legislature thus made the achieved Tier 4 contribution level the status quo for purposes of negotiating contributions for the successor contract. Accordingly, during the negotiations for the next CNA after full implementation is reached -- here, the negotiations for the agreement that would succeed the 2014-2018 CNA -- the Tier 4 contribution levels would constitute the status quo.

In N.J.S.A. 18A:16-17.2, the Legislature did not expressly discuss the scenario in this case, in which the employees reached "full implementation" of the premium share with three years remaining in the term of their current CNA.  It implicitly addressed the setting of this case, however, by making the Tier 4 contribution rate the status quo from which a successor CNA would be

25

negotiated. Moreover, nothing in the statute authorizes an immediate reduction of employee health care contribution rates to their pre-Chapter 78 levels. To the contrary, the Board submits, N.J.S.A. 18A:16-17.2 provides that once achieved, Tier 4 contribution levels are to remain in effect unless and until the parties negotiate lower health insurance premium contribution rates in the next CNA.

The Board has thus presented a legitimate argument that the plain language of N.J.S.A. 18A:16-17.2 requires that the employees sustain their health insurance premium contributions at Tier 4 levels for the entire span of the 2014-2018 agreement, and that the statutory language resolves the parties' dispute.

2.

To the extent that N.J.S.A. 18A:16-17.2 leaves any ambiguity as to legislative intent, the legislative history of Chapter 78 resolves that ambiguity. It demonstrates that the Legislature viewed public employee health care costs to present a fiscal crisis and that it acted to provide a long-term solution to that crisis. The legislative history bolsters the Board's argument that the Legislature intended that Tier 4 contribution rates would remain in effect for the duration of the term of the CNA in effect when the employees reached "full implementation." N.J.S.A. 18A:16-17.2.

26

When the Legislature enacted Chapter 78, it addressed state and local government contributions to employee health benefits that a succession of governors and legislators viewed to be unsustainable. In his 2005 Executive Order appointing the Benefits Review Task Force, Governor Richard J. Codey stated that "continuing increases in employee benefits costs contribute to the structural deficit that New Jersey faces every year," and noted that employee health care costs were expected to increase to twenty percent of the state budget by 2010. Exec. Order No. 39 (May 25, 2005), 37 N.J.R. 2109(c) (June 20, 2005). In its Report issued later that year, Governor Codey's Task Force found that "[h]ealth care changes are the most difficult to address but in light of the rapid increase in costs, changes are necessary," and that "while wages are known and increases prescribed, healthcare costs are unknown, not prescribed, and annual increases often far exceed the rate of wage increases." Report of the Benefits Review Task Force to Acting Gov. Richard J. Codey 4, 27 (Dec. 1, 2005). The Task Force recommended "that all active and retired employees share in the cost of health care," with the State's contribution fixed at a specific amount. Id. at 27.

The following year, by concurrent resolution, the Legislature appointed four joint legislative committees to identify methods of addressing "[t]his State's high property taxes," viewed by the public "as regressive, inequitable,

27

burdensome, and a threat to the financial security of individuals and communities." Assemb. Con. Res. No. 3, 212th Leg. 2 (July 28, 2006). One of the committees that the Legislature created, the Joint Legislative Committee on Public Employee Benefit Reform, reported to the Legislature later that year that its "investigation of health benefits issues revealed a system plagued by the skyrocketing costs of health care that have dramatically increased the cost of health benefits for both current and retired public employees." Spec. Sess. J. Leg. Comm., Pub. Emps. Benefits Reform Final Report 57 (2006). The Joint Legislative Committee commented that "[w]hether some [of the Committee's recommendations] are achieved through collective bargaining rather than through legislation is less significant than ensuring that they are, in fact, achieved. Collective bargaining notwithstanding, it is clear that the Legislature needs to attach permanency to a number of the recommended reforms." Id. at 2.

In testimony before the Senate Budget and Appropriations Committee in support of Senate Bill 2937 -- the bill later enacted as Chapter 78 -- its sponsor, Senate President Stephen M. Sweeney, stressed the need for greater employee contributions to combat rising health care costs. See Darryl Isherwood, Observer, Full Text of Sen. Steve Sweeney's Testimony on Pension and Benefit Reform (June 16, 2011), https://observer.com/2011/06/

28

full-text-of-sen-steve-sweeneys-testimony-on-pension-and-benefit-reform/.

Stating that "[p]ublic employees need to pay a greater share of their health costs," Senate President Sweeney commented that the Legislature "must be fair to them and their families. But we must also be fair to the taxpayers who are on the hook. Anyone in this day and age who thinks health care can come practically free is simply not living in reality." Ibid.

After Chapter 78 was enacted, Governor Christopher J. Christie issued a statement that the health care benefit provisions in the statute "will substantially lower health benefits costs for local governments, including those at the county, school and municipal levels, representing another major step forward in providing real, long-term property tax relief." Press Release, Office of the Governor, Governor Christie Signs into Law Bold, Bipartisan Pension and Health Benefits Reform (June 28, 2011).

The gubernatorial and legislative initiatives that led to Chapter 78 and the legislative history of the statute itself thus confirm the Legislature's intent. The Legislature clearly viewed the increasing cost of employee health care to be among the State's most serious fiscal challenges, destined to worsen absent significant reform. The Legislature did not enact Chapter 78 to achieve only a transient increase in employees' health insurance premium contributions, followed by an immediate reversion to pre-statute contribution rates as soon as

29

employees had contributed at the Tier 4 level for a year. Instead, it envisioned that Chapter 78 would increase employee health insurance premium contributions over the long term.

In short, the construction of N.J.S.A. 18A:16-17.2 urged by the Board and adopted by PERC is consonant with the Legislature's intent, as reflected by Chapter 78's stated goals and legislative history.

3.

Finally, we do not share the Appellate Division's view that N.J.S.A. 18A:16-17.2 should be construed contrary to its plain language because the statute would otherwise produce an "absurd result." Ridgefield Park Bd. of Educ., 459 N.J. Super. at 61, 70-71. To the Appellate Division, the absurd result was that by virtue of the "timing and length of the successor contract," the Association's members would be required to "contribute at the Tier 4 level for three additional years," thus suffering a financial hardship. Id. at 61.

It is clear that N.J.S.A. 18A:16-17.2's financial impact on school district employees varied from district to district. If a four-year CNA governing employees in a particular district went into effect in 2011, the year that Chapter 78 was enacted, those employees would achieve "full implementation" in the last year of that contract and could immediately negotiate health insurance premium contribution rates for the next CNA. N.J.S.A. 18A:16-

30

17.2.  The timing was less favorable for employees of the Ridgefield Park School District, who did not achieve "full implementation" for purposes of N.J.S.A. 18A:16-17.2 until the first year of their 2014-2018 CNA.  The Association had the option to seek a one-year contract followed by a three-year contract as did the employees in Clementon Board of Education, but if that proved impossible, N.J.S.A. 18A:16-17.2 required the Board's employees pay at Tier 4 levels until the next CNA took effect.

N.J.S.A. 18A:16-17.2's impact on employee health benefit contributions based on the timing of a given CNA is not an "absurd result" warranting a departure from the statute's terms.  The Legislature has the authority to make judgments about how best to achieve its objectives, subject to constitutional constraints.  See Taxpayers Ass'n of Weymouth Twp. v. Weymouth Township, 80 N.J. 6, 40 (1976) (rejecting equal protection and due process challenges to a zoning ordinance regarding senior housing because the disputed age restriction was "a legislative judgment which ought not be disturbed by the judiciary unless it exceeds the bounds of reasonable choice"); State League of Municipalities v. State, 257 N.J. Super. 509, 519 (App. Div. 1992) (holding, with respect to an equal protection challenge to a statute, that "[t]he Legislature in addressing an issue must invariably draw lines and make choices, thereby creating some inequity as to those included or excluded.  As

31

long as 'the bounds of reasonable choice,' are not exceeded, the courts must defer to the legislative judgment") (quoting Taxpayers Ass'n of Weymouth Twp., 80 N.J. at 40); Piscopo v. Lemi Excavating Co., 215 N.J. Super. 149, 152 (App. Div. 1986) (finding that the Legislature's determination that age eighteen marked the end of a child's dependency did "not warrant [the statute's] invalidation" even though "the classification [was] in some respect imperfect or result[ed] in some inequities in practice" because the decision did not exceed "the bounds of reasonable choice" (quoting Taxpayers Ass'n of Weymouth Twp., 80 N.J. at 40)).

Here, the Legislature intended to prescribe employee health insurance contribution rates until the employees achieved full implementation of the premium share and the parties negotiated a successor CNA. N.J.S.A. 18A:16-17.2. It clearly understood that different school districts negotiate contracts on different schedules, and that the statute's impact would vary from district to district. Nonetheless, the Legislature envisioned that the transition between Tier 4 health insurance premium contribution rates set by Chapter 78 and contribution rates negotiated by school boards and employees would take place in the negotiations for the next CNA, not at some earlier stage. N.J.S.A. 18A:16-17.2. We do not view the Legislature's determination to generate an absurd result, and we decline to nullify its judgment.

32

E.

We concur with PERC's determination that the health insurance premium contribution rates paid by the Association's members were "preempted by statute" and therefore non-negotiable under the second factor of the Local 195 test. See Local 195, 88 N.J. at 403-05. We conclude that PERC properly granted the Board's request for a restraint of binding arbitration as to the health insurance premium contribution rates applicable to the Association's members.

IV.

The judgment of the Appellate Division is reversed, and the matter is remanded to PERC for further proceedings in accordance with this decision.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a dissent.

In the Matter of
Ridgefield Park Board of Education,

Respondent-Appellant,

and

Ridgefield Park Education Association,

Petitioner-Respondent.

JUSTICE ALBIN, dissenting.

Neither the language nor the legislative history of L. 2011, c. 78 (Chapter 78) mandates the result reached today by the majority, a result that denies the Ridgefield Park Education Association (Association) the benefit of its collective negotiation agreement (CNA) with the Ridgefield Park Board of Education (Board). The majority's strained interpretation of Chapter 78 -- an interpretation that the Appellate Division concluded "creates an absurd result" -- means that teachers and other employees in the school district will see their salaries substantially reduced to pay for health care costs in clear contravention of the agreement they reached with the Board. See In re Ridgefield Park Bd. of Educ., 459 N.J. Super. 57, 71 (App. Div. 2019).

1

Because, in my view, the majority has not read Chapter 78 in a way that fulfills the probable legislative intent consistent with the bargained for agreement between the Association and the Board, I respectfully dissent.

I.

The Legislature enacted Chapter 78 to address the fiscal crisis faced by the State and local governments saddled with rising health care costs. The objective of the legislation was to require greater health care contributions by public employees -- a scheme to be implemented over a four-year period -- and then to allow public employees and local governments to negotiate the level of public-employee health care contributions with the starting point being the fourth-year contribution rate under Chapter 78. See N.J.S.A. 18A:16-17.1 and -17.2. Chapter 78's sunset provision did not mandate that the fourth-year contribution rate continue into a fifth, sixth, or seventh year, unless those were the terms agreed to by an education association and a school board. See L. 2011, c. 78, § 83.

We are hampered by a limited record, but this much we do know. The Board and the Association signed a CNA effective July 1, 2011 to June 30, 2014 that required employees to contribute 1.5% of their salary or the statutory minimum to health care costs for the duration of the agreement. Chapter 78 went into effect shortly before the start of the CNA.

2

By operation of law, Chapter 78 superseded the 2011-2014 CNA's terms on the subject of employees' health care contributions. Over the next four years, Chapter 78 imposed on public employees the obligation to contribute, in each succeeding year, a greater percentage of their salaries to pay for health care coverage. The Tier 1, 2, and 3 contribution rates covered the length of the three-year 2011-2014 CNA.

As that agreement neared its end, the Board and the Association negotiated a four-year CNA effective July 1, 2014 to June 30, 2018, requiring the Board's employees to contribute 1.5% of their salary or the statutory minimum for their health care coverage. The Board and the Association knew that the Tier 4 contribution rate applied to the first-year of the CNA, and the appropriate deductions were made to the employees' salaries in accordance with Chapter 78.[1] The Board and Association also knew that Chapter 78 had a sunset provision and that, after the Tier 4 year, the parties could mutually agree to health care contributions below the Tier 4 rate.

Had the Board and the Association intended the Tier 4 contribution rate to govern the length of the four-year contract, the CNA's language presumably

---

[1] The record reflects that under Tier 4, employees earning from $50,000 to over $95,000 would contribute anywhere between 20% and 35% of the cost of their health care benefits for single coverage; between 12% and 30% for family coverage; and between 15% and 30% of the cost of health care benefits for member/spouse/partner or parent/children coverage.

3

would have said so. Surely, had the parties intended the Tier 4 contribution rate, the CNA would not have included the language they put in the contract -- that employees would contribute 1.5% of their salary or the statutory minimum for their health care coverage. The best evidence of the understanding of the parties' intent is the Board's actions. In the second year of the new CNA, the Board deducted not the Tier 4 contribution rate, but the 1.5% of salary rate.

Not until the August 13, 2015 Public Employment Relations Commission decision in Clementon Board of Education v. Clementon Education Ass'n, P.E.R.C. No. 2016-10, 42 N.J.P.E.R. ¶ 34, 2015 N.J. PERC LEXIS 76 (2015), did the Board have a change of heart and demand that its employees pay the Tier 4 rates rather than the negotiated rates for the remainder of the 2014-2018 CNA.

II.

The outcome of this appeal turns on the interpretation of N.J.S.A. 18A:16-17.2. The relevant portion of that statute provides:

> A public employer and employees who are in negotiations for the next collective negotiations agreement to be executed after the employees in that unit have reached full implementation of the premium share set forth in section 39 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c) shall conduct negotiations concerning contributions for health care benefits as if the full premium share was included in the prior contract. The

4

public employers and public employees shall remain bound by the provisions of sections 39 and 41 of L. 2011, c. 78 ([N.J.S.A.] 52:14-17.28c and [N.J.S.A.]18:16-17.1), notwithstanding the expiration of those sections, until the full amount of the contribution required by section 39 has been implemented in accordance with the schedule set forth in section 41.

. . . .

After full implementation, those contribution levels shall become part of the parties' collective negotiations and shall then be subject to collective negotiations in a manner similar to other negotiable items between the parties.

[N.J.S.A. 18A:16-17.2 (emphasis added).]

For sure, the statute is not a model of clarity, and the Legislature likely did not contemplate the contractual scenario before us.

One point is clear, however. The Board and the Association went into their contractual negotiations understanding that Tier 4 had to be implemented in the first year of the four-year contract and that after that first year the employees would have "reached full implementation."

One reasonable interpretation of the statute is that "the next collective negotiations agreement" refers to the CNA that would begin on July 1, 2018. But if that is the case, only then would the Tier 4 rate "become part of the parties' collective negotiations" and only then would the parties "conduct negotiations concerning contributions for health care benefits as if the full

5

premium share was included in the prior contract." See N.J.S.A. 18A:16-17.2. If that interpretation is correct, nothing in Chapter 78 states that the parties were not free to negotiate the 2014-2018 CNA without the Tier 4 level as the starting point of the negotiations.

Nonetheless, we should not presume that the Tier 4 levels did not "become part of the parties' collective negotiations" when the Board and the Association hammered out the terms of the 2014-2018 CNA. There is no reason not to effectuate the intent of the parties according to the terms of the CNA. Chapter 78 does not mandate nonnegotiable Tier 4 contribution rates after employees reach full implementation. Nor does Chapter 78's legislative history suggest such an outcome.

Nowhere in Chapter 78 did the Legislature dictate that the negotiating parties could not agree to a four-year CNA in which, after the employees met their Tier 4 obligation in the first year of the contract, the employees would be subject to lesser health care contributions in the three succeeding years. The Legislature did not require an artificial construct -- compelling the parties to enter a single-year contract covering the Tier 4 obligation and then negotiate a new contract.

The majority reads Chapter 78 in a way to extinguish the expectations of the negotiating parties and impose on the public employees the more onerous

6

Tier 4 obligations for an additional three years beyond the sunset provision. The majority has construed Chapter 78 not to reach a logical but an inequitable conclusion.

### III.

Had the Association the prescience to foresee how the majority would interpret Chapter 78, it undoubtedly would have entered a one-year contract with the Board, during which Tier 4 would have been implemented, and begun negotiations anew. The wholly unfair and unreasonable result reached in this case, which strikes down terms in a negotiated agreement, is not consistent with the Legislature's probable intent in passing Chapter 78.

I therefore respectfully dissent.